**MENDEZ et al. v. MURDOCK et al.**
**No. 5149.**

United States District Court
W. D. Missouri, Kansas City Division.
April 21, 1949.

---

[1] This opinion was withdrawn by a superseding opinion of March 21, 1949. 173 F.2d 935.

Arthur R. Wolfe and James R. Sullivan, both of Kansas City, Mo., for plaintiffs.

Thomas C. Swanson and James Daleo, both of Kansas City, Mo., for defendant Fatall.

James E. Campbell and Edward B. Wilkinson, of Campbell & Fox, all of Kansas City, Mo., for defendant Murdock.

DUNCAN, District Judge.

The plaintiffs, husband and wife, are residents of Dallas, Texas. At the time of the filing of this suit, defendants were both residents of the State of Missouri.

Plaintiffs' complaint is in two counts— count 1 in replevin, and count 2 in conversion. In the first count of their com-plaint, plaintiffs allege that they are the joint owners of, and lawfully entitled to the possession of, a bracelet containing approximately fifty cut diamonds (fully described in the complaint), of the value of $5000, which, it is alleged, was wrongfully taken from plaintiffs by the defendants, and the plaintiffs seek to recover their bracelet and the sum of $2500 damages for the detention thereof.

In the second count of their complaint, the plaintiffs allege that the defendants without plaintiffs' permission or consent, unlawfully, wilfully, maliciously and wrongfully took and converted the said bracelet to their own use, and the plaintiffs ask actual damages in the sum of $5000, and punitive damages in the sum of $5000. They also seek to enjoin the defendants from transferring, selling or otherwise disposing of the bracelet.

The defendant Murdock, at the time of the occurrences complained of in the complaint, was part owner and manager of a restaurant-cocktail lounge known as the "Chaz-Jay" located in Estes Park, a summer resort in the State of Colorado.

At the time of the institution of this suit, the defendant Fatall was in actual possession of the diamond bracelet, holding it as security for a loan to Murdock, who had previously had possession of said bracelet.

During the latter part of July, 1947, the plaintiffs were vacationing at Estes Park where they became acquainted with the defendant Murdock in his restaurant-cocktail lounge. The Mendezes took most of their meals in Murdock's restaurant and apparently patronized his business to a considerable extent after their arrival in Estes Park.

The plaintiffs were not present at the trial of the case. The deposition of Mrs. Mendez was taken in Dallas shortly before the trial and was introduced in evidence. The deposition of her husband was not taken, nor does his testimony appear in the case.

Testimony on the part of the plaintiffs tends to show that shortly after their arrival at Estes Park, Mrs. Mendez had the bracelet in question and certain other jewelry sent to her at her request by air mail.

from her home in Dallas, Texas. Her husband was not present at Estes Park at that time. Mrs. Mendez testified that on or about the first of August, she was wearing the bracelet in Murdock's cocktail lounge when it was observed by him and he told her he could get $6500 for it. She further testified that she agreed to permit him to make an attempt to arrange a sale, and turned the bracelet over to him for that purpose.

Murdock testified that shortly after he became acquainted with the Mendezes, he asked Mrs. Mendez to make him a loan of $2500 for the purpose of completing the construction of a building he was putting up in Estes Park; that Mrs. Mendez said she didn't have the money, but that she did have some jewelry which she would permit him to use as collateral for a loan; that she immediately had the bracelet in controversy sent to her from her home in Dallas, Texas; and, that upon its arrival at Estes Park, and while he and Mrs. Mendez were seated alone at a table in the cocktail lounge she delivered the bracelet to him for use in negotiating a loan.

At that time Murdock's arms were both in a cast, as a result of fractures, and he says that Mrs. Mendez slipped the bracelet into his shirt pocket as they sat at the table. Whichever story is true, the bracelet was voluntarily delivered by Mrs. Mendez to Murdock—one saying that it was delivered for the purpose of sale, and the other saying that it was delivered to be used in obtaining a loan. Murdock says he placed the bracelet in the restaurant safe, and that within a day or two—at least within 48 hours—he flew to Kansas City, Missouri where he registered at the President Hotel. Subsequently he went to what is known as the "Jungle Club" a tavern and night club in Kansas City, in an effort to find someone who would loan him money on the bracelet. There he says he contacted a man known as "Bully Rich" whom he knew, and that he made inquiry of him concerning the desired loan, and the bracelet was left with him, Rich, who thought he could find someone who would be interested.

After Rich received the bracelet, he contacted the defendant Fatall, whom he had known around Kansas City. Fatall said he might be interested, and the next day he and Murdock, who apparently at that time were not acquainted, were brought together in the "Jungle Club." After this meeting, they then went across the street to a loan office and discussed the matter. Inquiry was made of Murdock as to where he had obtained the bracelet, and his statement was that it belonged to his wife.

Fatall took the bracelet to a jeweler friend for an estimate of its value, and received a report indicating that it was worth well in excess of the amount Murdock sought to borrow. Then, in the loan office, Fatall gave Murdock $500, and Murdock executed a promissory note in the sum of $2500. Murdock says that he paid a clerk or someone in the office $1 or $1.50 to make out the chattel mortgage and the note. At that time Fatall did not have all of the money, and it was understood that he would deliver $1700 to Rich, who, in turn, would give it to Murdock. This was done the next day, and Murdock immediately returned to Estes Park, where, according to his testimony, he told Mrs. Mendez that he had made a loan and he also says that he gave her the name and address of Fatall so that she might recover the bracelet in case anything should happen to him.

Mrs. Mendez testified that several days after Murdock's return to Estes Park, she asked him if he had sold the bracelet, and he said "no"—adding that those things couldn't be done too quickly, since one had to find a buyer. About two weeks after that conversation, Mrs. Mendez left Estes Park without any further information concerning her bracelet, or, so far as the evidence shows, without making any further inquiry concerning it.

Murdock encountered some economic reverses, lost his business, and has since paid but $500 on the $2500 promissory note. Shortly after this suit was filed, by agreement of the parties, the bracelet was placed in escrow in a bank in Kansas City, Missouri, where it is now located.

The plaintiffs contend that the chattel mortgage is void for several reasons: First, because Murdock had no right to hypothecate the bracelet—that at most it came into his possession for the purpose of

sale; second, that under the circumstances, the defendant Fatall was not acting in good faith in making the loan; and, further, that under Section 3231, Mo.R.S.A., the transaction was usurious, and as a result the chattel mortgage is absolutely null and void.

It is a well settled principle of law that "no man can be divested of his property without his consent." Metzger v. Columbia Terminals Co., 227 Mo.App. 135, 50 S.W.2d 680, 681. But, it is also true that when one of two innocent persons must suffer a loss due to the fraud of a third, the one whose acts of negligence, carelessness or trustfulness caused the loss, should bear it. C. I. T. Corp. v. Hume, Mo.App., 48 S.W.2d 154, 157; Cummings v. Hurd, 49 Mo.App. 139, 148. Plaintiffs have cited numerous cases in which this principle of law is discussed. Most of those cases relate to automobiles and to notes or other types of security.

It is my opinion that there is no indication in this case that there was any lack of good faith on the part of Fatall in advancing the money on the bracelet. Fatall had apparently known Rich, and Rich had known Murdock for some time prior to this transaction. Murdock had been engaged in the operation of various night clubs or taverns, had at one time been a deputy sheriff, and at another time had been a park policeman in Kansas City, Missouri.

It is probably not an unusual thing for men engaged in the type of business in which these men were engaged, to obtain property of this kind. There may at times be some question as to just how they are acquired, but such things do change hands as a result of games of chance and the ownership will be absolutely legitimate. There is however, no question of that kind in this case.

Whether Murdock came into possession of the bracelet for the purpose of sale or for the purpose of using it as security, is of no consequence. Mrs. Mendez says in her deposition that she gave the bracelet to him, that he had rightful possession of it, and that he had a right to take it to Kansas City, Missouri. Probably such business transactions are not entirely free from criticism, but they are occurrences that take place quite frequently—particularly with pawn brokers and other persons who loan money. It is impossible to trace the ownership of all personal property that is sought to be hypothecated in what is apparently a legitimate manner.

But, if the question is important in determining whether or not Murdock had a right to use the bracelet as collateral for the loan, I am inclined to the belief that he did have the right to use it as security. There are some circumstances connected with the transaction which lead to that conclusion. I think the conduct of Murdock was reprehensible and deserving of the bitterest condemnation. Apparently he waited until after Mrs. Mendez's husband had left Estes Park before approaching her concerning a loan. Mrs. Mendez was apparently still frequenting the cocktail lounge or restaurant where she and her husband had made Murdock's acquaintance. He says he thought that she had money, and that it was an opportunity for him to secure a much needed loan. The entire transaction was done in a rather secretive manner. So far as Mrs. Mendez was concerned, there was no consideration for permitting him to use her bracelet for the loan.

On the other hand, there was no reason for Mrs. Mendez to deliver possession of the bracelet to Murdock, who was almost a total stranger. If the bracelet was worth $5000, plans for its sale did not have to be executed in that manner.

Upon Murdock's return to Estes Park, Mrs. Mendez says she found it difficult to talk privately with him, although there seems to have been no such difficulty prior to the delivery of the bracelet to Murdock. Notwithstanding Murdock's reticence and the fact that Murdock told her he had not sold the bracelet, she left Estes Park some two weeks later without having made further inquiry. It was several weeks, about the end of September and after her return to Dallas, before she wrote to Murdock about the bracelet and asked for its return, or even revealed to her husband what she had done with it. Her actions with respect to the whole matter either indicate a considerable carelessness with respect to a

valuable piece of property, or they substantiate Murdock's statements to the effect that she permitted him to use the bracelet to secure a loan.

Under the evidence, it seems clear to me that but one conclusion can be reached, i. e., that Murdock rightfully came into the possession of the bracelet and that Fatall was justified in accepting it as collateral for the $2500.00 loan. The plaintiffs' contentions in these respects must therefore be without merit.

■ The most serious question in the case is that which concerns the charge of usury. Section 3231, R.S.Mo.1939, Mo. R.S.A., provides:

"In actions for the enforcement of liens upon personal property pledged or mortgaged to secure indebtedness, or to maintain or secure possession of property so pledged or mortgaged, or in any other case when the validity of such lien is drawn in question, proof upon the trial that the party holding or claiming to hold any such lien has received or exacted usurious interest for such indebtedness shall render any mortgage or pledge of personal property, or any lien whatsoever thereon given to secure such indebtedness, invalid and illegal."

Under this statute, if Fatall charged a greater amount of interest than the statute allows, the chattel mortgage would be absolutely void. Gehlert v. Smiley, Mo.Sup., 114 S.W.2d 1029; Davis v. Akers, 73 Mo. App. 531. It is undisputed that the note was made payable six months after date. There was no provision in the note for interest. The note was in the amount of $2500 and Murdock received $2200. If the remaining $300 is interest, it would be the equivalent of a rate of interest of approximately 28%. Fatall testified that he was not to receive all of the money, but that 'Bully' Rich was to receive a portion of it as a commission. Fatall's testimony on this point was:

"Q. What happened there when you gave 'Bully' Rich $1700.00? A. Well he asked me for the $300.00 difference and I told him I didn't have it then, but I would take care of it later when I sell the bracelet or he paid me the $2500.00—I would

take out my interest or—(interruption— objection)

"Q. Now do you say 'Bully' Rich asked you for the balance $300.00 is that right? A. Yes sir.

"Q. What did you tell him on the balance of $300.00? A. I told him that I didn't have it then, that if I sold the bracelet or collected the $2500.00 I would take out my interest and I would give him the rest of the money, which would be around $200.00 or $225.00.

"Q. Did he tell you whether he had an understanding with Mr. Murdock as to whether he was to receive something for obtaining the loan? A. Yes sir.

"Q. He told you that? A. Yes sir.

"Q. Have you ever asked Mr. Murdock or anybody else for any more than the $2200.00 and your interest? A. No sir.

"Q. And all you are interested in is your $2200.00 and your interest? A. That is right.

"Q. And at the time you made this loan did you have any intention of charging usurious interest for loaning the money?"

(To which an objection was sustained.)

Murdock stated in his deposition and in his testimony at the trial that he executed the note in the sum of $2500; that he received $2200; and, that the difference between the amount he received and the amount to be paid by him was interest for the use of the money. Rich did not testify.

■ The testimony of Fatall, as above quoted, is at variance with Murdock's testimony. If Rich was entitled to a commission to be paid by Murdock out of the proceeds of the loan, the amount to be received by him could not be considered in determining whether or not the interest was usurious. On the other hand, if Rich was to receive compensation from Fatall, then that amount must be considered in determining whether or not the interest rate was usurious.

It is undisputed that Rich never at any time made any demand upon Murdock for any amount of money. He had the money in his possession at one time, and did not withhold any of it or even request a part of it. In his deposition Fatall stated that the

$300 was for commission, interest and for making out the papers. In his deposition, as well as in his testimony at the trial, Murdock has denied that there was ever any arrangement between him and Rich by which he was to pay Rich a commission. Even taking Fatall's testimony, that Rich was to receive $200 or $225 out of the $300 as commission, as true—which seems to the court to be highly improbable—it would still render the amount to be retained by Fatall as interest on the loan, as usurious.

■ The only possible theory upon which the lien could be sustained and held valid under Section 3231, supra, would be to hold that Fatall was the agent of Murdock in paying to Rich a commission for obtaining the loan. When the lender acts as agent of the borrower in paying a commission to a third party out of the proceeds of the loan, then the amount so paid is not to be considered in determining whether the amount of interest is usurious. But here the only evidence of such agency comes from Fatall himself, and his testimony in that respect is indefinite and uncertain as to amount, and is in direct contradiction of the testimony of Murdock, who says that Rich was to receive no commission from him.

■ The court can therefore come to but one conclusion, i. e., that the $300 was to be charged as interest on the loan of $2200. This renders the transaction clearly usurious and under the statute, invalid and illegal.

Considering the nature of this entire transaction, from its inception in the cocktail lounge in Estes Park to its final conclusion, I think that the court would be justified in using language that is pretty generally understood in such quarters and could say that Fatall is the "fall guy" in this case. He advanced the money in good faith, but when he made the loan he violated a Missouri statute with which he was no doubt unfamiliar. That statute renders the transaction invalid and illegal. "Ignorance of the law excuseth no man." So often, after a mistake is made, it can be seen that legal advice would have been of value. The advice of counsel would have been well worth its price to Fatall in this instance.

The mortgage transaction being illegal and invalid from its inception, the plaintiffs are entitled to recover the bracelet and their costs herein expended.

There is, however, no merit to plaintiffs' claim for damages, actual or punitive, and such relief is hereby denied, and the second count of their complaint is dismissed.

It is so ordered.